We will hear argument first this morning in Case 18-14-47, Republic of Hungary v. Simon. Mr. Silbert? Mr. Chief Justice, and may it please the Court, comedy-based abstention proceeds from a simple premise that this Court has recognized since 1885. When a complaint alleges that foreign parties harmed other foreign parties in a foreign country, a federal court can decline jurisdiction in favor of a foreign tribunal. In this case, plaintiffs allege that Hungary took property from Hungarians in Hungary during World War II. The United States long ago settled its claims against Hungary for wartime property confiscations, yet plaintiffs ask an American court to apply American law and impose economy-crushing liability on another sovereign nation for conduct in a sovereign's own territory that harmed its own nationals more than 75 years ago. If the shoe were on the other foot, and the United States faced analogous claims in a foreign nation's courts, the comedy grounds for dismissal would be clear and undeniable. Those grounds are every bit as strong when the United States orders Hungary to submit to the jurisdiction of an American court. If these same plaintiffs had sued private defendants for aiding and abetting the same property confiscations, their claims could be dismissed because of the risk of international friction. Plaintiffs say this case can't be dismissed only because they sued sovereign defendants under the Foreign Sovereign Immunities Act, but for three reasons that can't be right. First, the FSIA's plain text tells us that it concerns only sovereign immunity from jurisdiction. It has no effect on non-jurisdictional prudential doctrines like comedy-based abstention. Second, the FSIA says that when sovereign defendants lack sovereign immunity, they should be treated the same as private defendants, not worse than private defendants. And finally, the FSIA undisputedly leaves in place other prudential grounds for declining jurisdiction like forum nonconvenience, and there is no textual or other basis to treat comedy any different. Mr. Silbert, I want to pick up on that very last thing you said, but look at it from a different perspective. What independent role do you think international comedy plays, given the fact that you already have or there are unchallenged forum nonconvenience grounds and active state grounds? What is the independent significance of international comedy? The international comedy doctrine applies in different circumstances than FNC and active state, and it serves different interests. The forum non-doctrine in particular ultimately serves objectives of convenience and the practicalities of litigation. The interests served by the international comedy doctrine are quite different. They go to the- Well, you talked about, you know, this case involves Hungarian citizens suing Hungary for events in Hungary. Those sound like considerations a court would take into account under forum nonconvenience. They might be, Your Honor, but the D.C. Circuit held in this case that the FNC doctrine does not apply. We think the international comedy doctrine clearly does apply, and even if they did happen to apply in the same cases, they do serve different objectives because the comedy doctrine is not ultimately about questions of convenience or practicality. It's about the dignitary interest that each sovereign has when it has a competing claim to jurisdiction. Thank you, Counsel. Justice Thomas? Yes. Thank you, Mr. Chief Justice. Counsel, just perhaps a somewhat preliminary question and a bit different from the Chief. If we come out, if we reverse in the following case in Germany, hypothetically, what should we do with your case? Well, Your Honor, you could then hold that there is no jurisdiction in this case and vacate the D.C. Circuit's decision. You also could go on to decide the comedy question, as this court's decision in Sinekem and in Levin against Commerce Energy made clear, and under the circumstances, I think it would be useful if this court did go forward and reach the comedy issue because that is a question that has divided the lower courts, and there is substantial confusion about when comedy applies and how it applies, and I think the lower courts would benefit from guidance from this court. So if we do not think, for example, if I don't think that comedy existed pre-1976, do you think we have the authority to just create a doctrine such as that? I think you have the authority to do it, Your Honor. I understand that this court has not created common law doctrines like that very much recently. I do think it's clear that the comedy defense that we're asserting did exist prior to the enactment of the FSIA. It's discussed explicitly in the Belgian Linde. It's discussed in Canada Malting. Justice Scalia's dissenting opinion in Hartford Fire discusses the doctrine at length. Justice Breyer's concurring opinion in Keoghville and Justice Sotomayor's dissenting opinion in Jesner all talk about the doctrine. But wouldn't that take us just, excuse me, I'm sorry, Tom, I just want to get this in. Wouldn't that get us back to where we were pre-FSIA on having these decided on a case-by-case basis? It wouldn't, Your Honor. The problem with the pre-FSIA regime was that sovereign immunity determinations were left to the executive and the executive was subjected to political or diplomatic pressure in individual cases. The comedy doctrine that we're asserting is easy for courts to apply and it demands nothing from the executive. The courts start by asking a simple question. Does this complaint allege that foreign parties harmed other foreign parties? Thank you, counsel. Justice Breyer? I'd like to pick up on that last question. One, as the Chief, I think, brought up, how do we know that comedy is a separate doctrine rather than, say, a motivating principle underlying a bunch of other doctrines like foreign nonconvenience and exhaustion and sovereign immunity and abstention? And if it is a separate doctrine, what exactly does it consist of? Do you prefer the Ninth Circuit, which has five factors? Aistryker and Lee are good international law professors, suggest four factors, and maybe you have some other factors. Well, I think Your Honor, first, is correct that principles of comedy find expression in a number of different doctrines of U.S. law, including sovereign immunity and active state. There is a separate and distinct comedy-based abstention doctrine that this court recognized as far back as the Belgian Linde, and it's clear that the application of that doctrine did not depend on factors of convenience or practicality because this court in 1885 said the courts looked to motives of international comedy, and those principles are simply different than the ones, the interests, that FNC serves. As to how to apply the doctrine, again, I think, first, the court should ask, is this a case alleging that a foreign party harmed another foreign party? And if it is, then I think a comedy-based abstention may be available, and I think the court should then ask the question that you asked, Justice Breyer, in your concurring opinion in Keoghle, and that is, is there nonetheless a distinct American interest in the controversy that would justify the assertion of jurisdiction? And if there isn't, I'm sorry, Justice Breyer, were you asking a question? No, no, no. Okay. So, I think, again, in a case where a foreigner harms another foreigner, there is a comedy interest that may warrant abstention, and the court then asks, is there a distinct American interest that would justify asserting jurisdiction here? If there is, then a court may exercise jurisdiction, but in this case, where there isn't, a court should decline jurisdiction and abstain so that the sovereign that has the paramount interest in the controversy can address it under the framework of its own legal system. Justice Alito? Section 1606, on which you rely, makes a foreign state, quote, rival in the same manner and to the same extent as a private individual under life circumstances. Your friend on the other side says this concerns substantive liability rather than threshold federal common law defenses. Why isn't that a reading that's more faithful to the statutory text? So, two answers, Justice Alito. First, we think we would win on the statutory text even if Section 1606 were not in the statute, just based on the language of 1605, but I do think that Section 1606 helps us, and it helps us because it refers not only to the extent of liability, but also the manner of liability. And so, for example, if a private defendant would not be subjected to class action liability in a U.S. court, then a sovereign defendant should not be subjected to class action liability in a U.S. court, because that is the same manner of liability. And I would also note that my friend has no textual explanation for why the forum non-convenience doctrine survived the enactment of the FSIA, because like comedy-based abstention, FNC is another common law doctrine that permits a court to decline jurisdiction. And so, if that doctrine survives, then I think comedy-based abstention also must have survived. One other question. If we were to rule hypothetically, and this is just hypothetical, in favor of Germany on the jurisdictional issue, wouldn't the plaintiffs in this case still have an argument based on their claim of denaturalization? I don't think so, Your Honor. I think if that argument had merit, then it would apply in every case where the plaintiffs in the next case would assert that there is jurisdiction. In other words, if the domestic takings rule does not apply in instances of genocide, then I believe the argument that my friend makes that the plaintiffs here were stateless persons would apply in every such case. So, thank you. Thank you, counsel. Justice Sotomayor? Counsel, I don't understand how, if in the following case, hypothetically, we were to decide there's no jurisdiction, what power would we have essentially to give an advisory opinion on this international comedy doctrine? I thought no jurisdiction meant just that, that we don't have the power to decide anything. Well, Justice Sotomayor, this court held in Sinachem and again in Levin that a court can dismiss on threshold comedy grounds without first determining that it has subject matter jurisdiction. That was the... Counsel, I understand that principle, but this is something different. We have already decided we have no... We would have already decided we have no jurisdiction. So having made that decision, how would this become nothing more than an advisory opinion? I think, Justice Sotomayor, you certainly could then hold that you have no jurisdiction in this case and vacate the court of appeals decision. One final point, as I read the record below, it appeared that this prudential international comedy doctrine was not really the focus of your argument in briefing. It seemed to me that the focus was on the... That respondents had to exhaust their remedies. This, what you've raised before us, seems like a very different tact. Well, I think in the circumstances of this case, Justice Sotomayor, they amount to the same thing. Our point is that because of principles of comedy, these plaintiffs should first assert their claims in a Hungarian court. And because they first asserted them in an American court, the American court should decline jurisdiction and the case should proceed originally in Hungary. I think whether you call that an abstention principle or an exhaustion principle, the point is that Hungary should have the first opportunity to address these claims. But you did use the word exhaustion. Thank you, counsel. Justice Kagan. Mr. Sober, you've referred a couple of times now to the historical basis of the comedy doctrine. There's an amicus brief by Professors Dodge and Gardner that takes you on on that and that says that all the various cases that you cited fall into one of two categories. Some are immunity cases and some are form nonconvenience cases. And that there's really no historical basis for this separate international comedy. So I think I'd like you to respond to that brief. If you look at the Belgian Justice Kagan, which was this court's decision in 1885, it says two things that directly refute that position by Professor Dodge and Professor Gardner. First, it says expressly that courts decline jurisdiction in cases between foreigners out of motives of both convenience and international comedy. So those are two separate doctrines. But even more to the point, it says that in some cases, before exercising jurisdiction in cases involving foreign interests, federal courts would seek the consent of the consul of the foreign nation with a competing claim to jurisdiction. And clearly, that foreign consul was not providing an opinion about matters relating to the convenience of the parties. What the foreign consul was telling the courts was whether exercising jurisdiction in a U.S. court would be an affront to the dignity of the other nation with a competing claim to jurisdiction. That is a comedy interest, not a form nonconvenience interest. You're pointing me to Belgian land as your best case. That's the one I should read? I think the Belgian land is clear on that subject. We've also cited two district court cases. Okay. If I could just go on. Please do. You said we're not going back to the old immunity doctrine, the one that was supposed to have been displaced by the FSIA, because that was executive driven. But I would think the fact that it was executive driven would cut the other way. At least the executive knew something about foreign affairs and were politically accountable. And it seems like much of the unhappiness about that doctrine had to do with the fact that it was a kind of kitchen sink approach and nobody could predict it.  We're not, Justice Kagan. We're not asking federal courts to make any kind of foreign policy judgment. What we're asking the courts to do is to do what this court did in Sosa, in Kiobel, in Jesner, in Argeo Nabisco, in Epigram, and a number of other cases. And that's simply recognize that when a lawsuit asserts claims by a foreigner against another foreigner, especially for conduct in a foreign country, there is a risk of international friction. Thank you, Counsel. Justice Gorsuch? Counsel, that's exactly where I wanted to go, which is, you know, prior to the FSIA, we did have what this court has described as bedlam in a multi-factor balancing test on the convenience of the parties is one thing, but also international friction and a sense about foreign dignity and all that, which is, Justice Kagan pointed out, was channeled through the State Department. And here you're asking us to do it directly. And I guess I'm still struggling with what's the difference between the regime you'd have us create and the regime that Congress clearly wished to displace because it was producing, quote, bedlam. Well, in the regime that Congress displaced, the executive was forced to make foreign policy judgments. In the regime that we are proposing, the courts would avoid making foreign policy judgments by recognizing... But you said we should be concerned about friction, for example. Well, I think the courts can recognize the kinds of cases that would cause international friction... Isn't that a foreign policy judgment? It's not, Justice Gorsuch. I think my friend is asking you to... All right, let's say I disagree with you. That sounds to me like a foreign policy judgment. Then what? Well, if a court accepted jurisdiction in this case and extended U.S. or D.C. common law to apply in an international context to regulate the conduct of foreigners or foreign sovereigns harming other foreigners in a foreign country, that is a foreign policy judgment. So if you think my rule is a foreign policy... I agree with that. So what do we do on a separate but related matter, which is normally we assume that when Congress dictates that we shall hear certain classes of cases, that we have a duty to hear those certain classes of cases. And we can't decide not to do it just because it would be inconvenient to us. Well, that is the general rule, Justice Gorsuch, and this court has recognized discrete exceptions. And one of the exceptions, as set out in Canada Malting and in the Belgian Linde, is that courts have discretion to decline to hear controversies between foreigners. Justice Kavanaugh. Thank you, Chief Justice, and good morning, Mr. Silbert. On your point that it's easy for courts to apply this, I hear you giving us something of a bright line that if it's foreign defendants who injured foreign plaintiffs in a foreign country, then abstain. Is that accurate? I think if there are no other relevant facts and circumstances, then yes, Justice Kavanaugh. Okay, well, what could be other relevant facts and circumstances? Well, let's say, for example, the controversy concerns a discrete piece of artwork. And that piece of artwork is hanging in a gallery in Washington, D.C. And let's say if the possessor of that piece of artwork gives it back to the wrong party, that U.S. party could become liable. Then there would be an interest in a U.S. court hearing the dispute. And maybe that interest is sufficient to override the foreign interest. How do you see this playing out in the Hungary courts? Well, the plaintiffs would file a civil action as they would in any normal case. Hungary has waived by constitutional amendment any statute of limitations to these claims. They would file claims under, we believe, the Hungarian Code of 1959, which was the first codified law in Hungary and which applies to causes of action that accrued before its enactment. The claims would be Hungarian versions that are similar to the claims they've already filed. And they would go forward and litigate their claims like any Hungarian plaintiff. And you say in your reply brief that they think they were treated unfairly in the Hungarian courts. They could go to the European Court of Human Rights. Is that accurate? That is accurate, Justice Kavanaugh. If there was a violation of the rules set out in the European Convention of Human Rights, like the rule under Article VI to a fair trial by an impartial tribunal, then the plaintiffs, after exhausting Hungarian remedies, could apply for relief to the European Court of Human Rights. Thank you. Justice Barrett? Good morning, Mr. Silbert. So you told Justice Sotomayor, when she asked you about the distinction between exhaustion and the comedy doctrine that we're talking about this morning, that whether you call it abstention or exhaustion, it means you go to Hungary first, that they're functionally the same thing here or they're very closely related. But if these plaintiffs had exhausted in Hungary first, I gather from your answer to Justice Kavanaugh that they still could not come here, that the doctrine of international comedy that you proposed would still be a bar. Is that correct? Well, I think they could come here and seek relief like any plaintiff who had litigated in a foreign court could. And whether the U.S. courts would recognize the foreign judgment would be controlled by the principles set out in the Restatement of Foreign Relations Law at Sections 483 to 484. In other words, the same principles would apply in this case as would apply in any case where a foreign court had rendered a judgment. But that's a little bit of a different question, right? That's a question about the preclusive effect and whether any preclusive doctrines would themselves bar the plaintiffs from seeking relief here. Well, I think that, yes, it ultimately comes down to a question of preclusion. But if the, we believe the plaintiffs should first bring these claims in Hungary. If they did and if they exhausted all available Hungarian remedies and they came back here and it turned out that they were denied relief on grounds that were somehow illegitimate for reasons of, if the Hungarian remedies turned out to be a sham or a fraud, then I think they could try to reopen these claims in the United States courts. But why would that be? Because it seems that all of the concerns you're identifying, like the foreign cube, the nature of this suit, would still apply even if they had exhausted their claims in Hungary first. Well, I think it's appropriate for a U.S. court to ask in this context as it does in other abstention contexts whether there are available remedies in the alternative forum. And I think that plaintiffs should first seek relief from Hungarian courts. So you could call that an exhaustion principle. But once they do, if it turns out that Hungarian courts were not actually available, they could then press their claims in the United States. I think that should be a high bar. And it is a high bar under the restatement. But I don't think it's impossible in this case any more than any case involving a foreign judgment. Thank you, Mr. Silbert. A minute to wrap up, Mr. Silbert. Thank you, Mr. Chief Justice. I'd like to emphasize two reasons why I think you should be skeptical of the arguments made by my friend on the other side. First, my friend's position creates the anomalous result that it's easier to sue foreign sovereigns for conduct in their own territory than it is to sue private defendants for foreign conduct. And that should be a big red flag. If a case against private defendants causes too much international friction, that problem only gets worse when foreign sovereigns are named as defendants. Second, my friend never owns up to the reciprocity implications of her position. The treatment of foreign sovereigns by U.S. courts suggests that the United States can be treated the same way by foreign courts. So if my friend is right that this case must proceed against Hungary, then analogous suits  that is not what Congress intended. Thank you, counsel. Mr. Snyder. Mr. Chief Justice, and may it please the court. For well over a century, this court has recognized that when an American court encounters a case that raises serious foreign relations concerns, the court may abstain from the exercise of jurisdiction as a matter of international comedy if it determines that the case would be better heard in a foreign forum. Nothing in the Foreign Sovereign Immunities Act forecloses courts from applying that case-by-case abstention any more than it forecloses courts from applying the similar case-by-case analysis called for by the Foreign Nonconvenience Doctrine. On the contrary, as Judge Katsas correctly explained below, Section 1606 of the FSIA requires that when foreign sovereigns can be sued in American courts at all, they must be treated no worse than private foreign defendants facing equivalent claims. Because private foreign defendants are free to seek comedy-based abstention, Section 1606 therefore requires that foreign sovereign defendants must be free to do so as well. Mr. Snyder, this question will not surprise you. You emphasize the significance of the international relations context as a reason for international comedy. But your client, the United States, has scrupulously avoided taking a position on what the court should do, given the international relations context. This is the perfect time for you to fill that void. Why hasn't the government told the courts what the foreign relations impact on the United States is? Well, Your Honor, the United States doesn't feel that it has sufficient information about how the proceedings would unfold in Hungary to take... How long has the case been going on that you haven't gotten that information yet? Your Honor, the case has been going on for quite some time. I forget when exactly the complaint was filed in the case. We have the same information that the court has in terms of the party presentation and the expert declarations submitted in the case. Well, I'm sure that's true, but you also have other resources like our embassies, other communications between the two countries at the executive level. That's true, Your Honor. The State Department simply doesn't feel that it has sufficient information to provide the court with a recommendation. Mr. Snyder, surely they have as much information as they need to make a decision. They just don't want to make a decision. Your Honor, they have informed us that they don't have sufficient information to make a decision about that. Our interest in this case, though, is that more broadly, we think that the implications of the Court of Appeals' decision would be detrimental to U.S. policy inasmuch as the Court of Appeals said that courts may never abstain on international comity grounds. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Snyder, doesn't it seem that your suggestion and Petitioner's suggestion takes us right back to the case-by-case approach that FSIA was supposed to remedy? Well, no, Your Honor. Let me answer that in a couple of ways. The first is that if you look to the text of the FSIA, I think it's very clear from the text that what the FSIA was directed to address was sovereign immunity specifically.  Nor is it only for sovereigns. And this court has repeatedly recognized that in adopting the FSIA, Congress was not intending to displace every other doctrine. So most closely analogous here, the court in Samantar recognized that the FSIA doesn't displace the very similar doctrine of official immunity. That remains subject to the common law rules. And we think the same thing is true here. Congress did not, in the text of the FSIA, seek to displace the international comedy-based abstention. And so that doctrine remains available. Does that abstention predate FSIA? Yes, it does, Your Honor. If you look back at the Belgian Lend, as my friend said, the court in the Belgian Lend specifically noted that American courts have looked to the views of foreign consuls in deciding whether to extend jurisdiction or to exercise jurisdiction over cases between foreign parties. And that in doing so, it took account both of questions of convenience and also questions of international comedy. So we think that those are distinct strands. Thank you. Justice Breyer? It's the same question. One of the things Congress seemed to be upset about and wanted to pass the FSIA was contradictory information from state. The American strawberry industry wants to sue the country of Xanadu, run by a terrible dictator. But in Xanadu, our strawberry industry is being sued by some Xanadu nationals. And state wants to help our industry. Now all I have to do is reverse the situation and they'll want to help them in opposite ways. So, depending on who's being sued where, you get a different result when you ask state. Is it immediately in our interest or not? And how is the American industry being hurt or helped? Is that something we should take into account in comedy? Your Honor, I think certainly courts can take account of American and foreign interests in applying the comedy-based abstention doctrine. I think one important difference between comedy-based abstention and sovereign immunity that helps to address some of the concerns is that, in our view, comedy-based abstention looks in particular to whether there is an adequate forum in the other country. And that's not something that sovereign immunity would look to. So, to the extent that Congress was concerned with ensuring that plaintiffs, especially American plaintiffs, would have a forum in which they could seek redress and that they would not be denied that forum based on political considerations, comedy accounts for that in a way that sovereign immunity did not. Justice Alito? If this doctrine is all about the effect on foreign relations, if I were a district judge and I received a motion asking me to abstain on comedy grounds, my first question would be, what does the government of the United States think about the foreign relations impact of this lawsuit? So, won't you be in the position of having to answer that question every time this doctrine is asserted? We don't think so, Your Honor. We think that there are certainly circumstances in which courts can make decisions about whether to abstain without needing participation from the United States government. There are certain considerations that are cross-cutting and that will always apply. So, for example, the United States certainly has more of an interest in adjudicating claims brought by United States citizens. The United States has more of an interest in adjudicating claims that concern conduct that occurred here in the United States. I mean, what if you, what if the judge at, what if the State Department says, we don't think that this raises foreign affairs concerns? Would that be despondent? I think that that should get substantial deference and might well be despondent, Your Honor, yes. I mean, there are almost 700 district judges. You want every one of them to assess whether a particular lawsuit raises foreign relations concerns? Your Honor, we think that it makes sense for the courts to be able to do that. When this court has expressed concern about the capabilities of federal courts in addressing foreign relations issues, the concern has been primarily about courts creating tension unintentionally. This is a very different context. The question here is whether courts may abstain from the exercise of jurisdiction and they will rarely create unintentional international friction by doing that. So the question is just whether you should completely foreclose them from doing so and we don't think that you should. Thank you. Justice Sotomayor. Counsel, I understood that the FSIA was passed to remove the pressure on the Department of State to decide whether or not immunity should be granted or not. I, like my predecessor colleague's questions indicate, don't know how that pressure would stop in this situation, but I also don't know why that judgment has not already been made by Congress. Meaning if we accept the argument in Germany that expropriations have to be at an international dorm involve only expropriations of non-nationals and not domestic people. And we dismiss that case. Or if we rule the other way and we say Congress intended for those suits to be in the United States, that yes, takings from nationals could have a forum here. I'm not sure how we can substitute, the court could substitute its judgment for Congress. Well, Your Honor, we don't think that the court would be substituting its judgment for Congress. Whenever the court applies an abstention doctrine, it is by definition determining that in a circumstance where Congress in the statute allowed for jurisdiction, that the court is not going to exercise that jurisdiction. So we don't think that a court should exercise jurisdiction, or excuse me, abstain from jurisdiction under the international comedy doctrine on grounds that would precisely replicate a judgment that Congress has already made. So why wouldn't the other doctrines that already exist, like foreign non-convenience, take care of virtually any other consideration would be addressed? Meaning the issue of foreign relations tension is exactly what the SIA was intended to, the judgment of Congress, that in these designated circumstances, those tensions should not lead to immunity. But why should they lead to abstention? Your Honor, I think the SIA had a more specific purpose, and you can see that from a text. It was about the circumstances in which courts should apply categorical immunity. But the court has recognized that that didn't deal with every other comedy-based doctrine that preexisted the SIA. Thank you, Counsel. Justice Kagan? Mr. Snyder, you told the Chief Justice that the State Department didn't have enough information to make a decision in this case. But if the State Department doesn't have that information, how are courts to have it? Well, Your Honor, we think that there's something of a difference between the scope of the decision that a court makes and the scope of the decision that the State Department makes. When a court makes a decision about whether to abstain in a particular case, the court is doing just that. It's making the decision about that particular case based on the evidence presented by the parties in that particular case. And I would think that that's exactly what the State Department would be doing here, too. It'd be looking at this particular case, the claims in this case, the alternative forum that Hungary is providing in this case, and they would make a decision. I mean, some might say that what's going on here is that the State Department is expecting the courts to do the difficult and sensitive and some might say dirty work for you. I don't think that's right, Your Honor. The issue that the State Department has in particularly indicated that it doesn't feel it has enough information to provide a recommendation on is how this case would proceed in Hungary. And that's a decision that courts already make in the context of the Foreign Nonconvenience Doctrine. And courts are well-suited to address the adequacy of an alternative forum. We know that because again, they do that already in the Foreign Noncontext. Thanks. When I asked Mr. Silbert about the historical basis of this doctrine, he gave me the Belgium land case as his principal case showing that this comedy-based doctrine and that your espousing in fact has such a basis. In your brief, you call Belgian land an early example of forum nonconvenience. So what's your best case, best historical case for this comedy doctrine? Your Honor, I would say the same thing. The Belgian land is the best case on this. It is true that this court has described the Belgian land as a precursor of modern forum nonconvenience doctrine. But if you look at the Belgian land, it's describing a whole swath of cases that involve different considerations. So relevant to modern forum nonconvenience doctrine, it talks about declining to exercise jurisdiction on the basis of convenience, but it also says that courts do so for international comedy grounds. Thank you, Mr. Snyder. Justice Gorsuch. Mr. Snyder, I guess I'm curious about this. Is what you're arguing for a broad-based comedy extension doctrine or an exhaustion doctrine? In response to Justice Kagan, I believe you said that the real confusion for the State Department apparently lies in what remedies would be available in Hungary. That sounds like exhaustion. And Mr. Silbert, in response to Justice Barrett, indicated that after exhausting Hungarian remedies, the plans to be free to come to the United States subject only to preclusion principles, which have nothing to do with abstention and would apply in domestically normal law. So what do you say to that? Is what you're arguing for really just an exhaustion argument? No, we don't think it's an exhaustion argument. I mean, we think there are some similarities between the two, but in our view, it's appropriate for a court at the front end to make a decision about whether it would be appropriate to abstain based in part on whether there is an adequate form available in the other country. Boy, that sure sounds like exhaustion doctrine to me. That's exactly what courts do at the front end. They say, have you exhausted your remedies elsewhere before we take up your case? That is exhaustion. Your Honor, to be clear, I'm not saying that the question is whether they have already exhausted them. I'm saying that the question is whether the remedies that would be available elsewhere are adequate. And so that's, we do that all the time under the rubric of exhaustion counsel. Okay, fine. Let's say they have to exhaust. Why? If Jewish victims of the Holocaust were deemed non-citizens, stripped of their citizenship, at least in Germany, why should they then have to go exhaust remedies elsewhere? Well, we haven't taken a position on that, Your Honor, but let me point you to a case in which we have. There's an amicus brief filed in this case by SNCS, the French National Railroad. And that amicus brief describes a case in the Seventh Circuit in which the district court appropriately dismissed claims that had been brought against SNCS. We think that was appropriate on international comedy grounds because the United States has worked with France to establish an administrative mechanism by which claimants who lost property during World War II in France can seek redress for those injuries. Thank you, counsel. Justice Kavanaugh. Thank you, Chief Justice. Good morning, Mr. Snyder. Is it your position that when a foreign defendant has injured foreign parties in a foreign country, that abstention is necessarily appropriate? No, Your Honor, we have not taken that right line approach. What else in that circumstance should a court ask itself? Well, first I'd say that the court should look in that circumstance to the adequacy of the alternative forum. Okay, if the alternative forum is adequate, anything else? I think in that circumstance, there would be a very strong case for abstention. What could defeat that? If the United States had some strong interest in the subject matter- And how would a district court determine that? So for example, if the property that were at issue were in the United States, that might give the United States a stronger interest. If there were some question of the ongoing negotiation of a treaty or if there were some law that Congress had passed expressing a particular interest in that subject matter, that might well affect the decision. And is the district court to do all that on its own or to seek the guidance of the State Department in that circumstance? Well, I think, Your Honor, certainly the court should not foreclose the possibility of the district court doing so when the State Department provides input, but we think that there may also be circumstances in which a district court can do that without the State Department's input. There may be circumstances in which there's a statute that expresses a particular United States interest in the subject matter, things along those lines on which the district court could base its decision. Thank you. Justice Barrett? Counsel, the doctrine that you're proposing of comity sounds like a little bit of this and a little bit of that. It incorporates some concepts from exhaustion and also sounds like foreign non-convenience. It also sounds like it incorporates some of the same considerations of foreign relations and friction with other countries that are addressed by the Foreign Sovereign Immunities Act itself. So would it subsume the need for some of these other doctrines? Like what role would foreign non-convenience still play if we do adopt this broader comity doctrine you propose? So I wouldn't call it a broader comity doctrine. I would say that it's a distinct comity doctrine. Foreign non-convenience is focused specifically on the litigants and their convenience and the convenience to witnesses, things along those lines. In an ordinary case, that makes sense, but in a case that presents significant foreign relations concerns, we don't think it makes sense to give weight to the plaintiff's choice of forum or the convenience of witnesses. Instead, it makes sense to look to those- But can I interrupt just for one moment? In this case, the foreign country or one of its arms is one of the litigants. So aren't its concerns taken to account in foreign non-convenience doctrine? No, Your Honor. The considerations that forum non looks to are considerations of convenience. The interest that international comity-based abstention looks to is more of the sovereign dignitary interest in being able to adjudicate claims that are touched closely on that foreign sovereign territory or its acts in its own fora. That's something that this court spoke to in the Pimentel case, for example. We think those are just categorically different. Thank you, counsel. A minute to wrap up, Mr. Steiner. The policy of the United States government with respect to claims for restitution or compensation by Holocaust survivors and other victims of the Nazi era has consistently been motivated by the twin considerations of justice and urgency. To that end, the United States has advocated that concerned parties, foreign governments, and non-governmental organizations act to resolve matters of Holocaust era restitution and compensation justly through dialogue, negotiation, and cooperation wherever possible. The potential availability of comity-based abstention in United States courts plays an important role in our diplomatic efforts on that issue. Accordingly, while the United States takes no position on the appropriateness of comity-based abstention in this particular case, the court should make clear that the FSIA does not foreclose such abstention. Thank you, counsel. Ms. Harrington. Thank you, Mr. Chief Justice, and may it please the court. I want to start by addressing the United States' interest in having these types of claims adjudicated in U.S. courts. This country has a strong and longstanding interest in directly helping Holocaust victims seek justice. Today is Pearl Harbor Day, and it marks 79 years exactly since the U.S. was drawn into World War II. The reason the atrocities at places like Auschwitz were stopped and were exposed to the world is due in large part to our soldiers who sacrificed in the name of the United States. This court has held over and over that our Constitution assigns responsibility for foreign policy to the elected branches, not to courts. And over the last 70 years, those branches have repeatedly taken steps to make it easier for plaintiffs to pursue Holocaust-era claims like these in U.S. courts. For example, more than two decades before the FSIA was enacted, the executive branch waived application of the active state doctrine in Holocaust-era expropriation cases, explaining in the so-called Bernstein letter that it sought to remove obstacles to court's jurisdiction to decide such claims on the merits. When Congress enacted the FSIA, it made clear that U.S. courts have jurisdiction to decide these types of claims, and Congress has updated the FSIA and enacted other legislation to make it easier for plaintiffs to pursue Holocaust-era claims in U.S. courts. Hungary and the U.S. now ask this court to recognize an abstention doctrine that would permit courts to overrule Congress's foreign policy determinations with no involvement from the executive. Such a doctrine runs afoul of separation of powers principles and has no foundation in our legal history. It would also undo the primary purpose of the FSIA, which was to eliminate ad hoc determinations about when courts should exercise jurisdiction over foreign sovereigns based on the foreign policy concerns of the moment. Hungary wants courts to decide whether these are the types of claims that should be heard in U.S. courts, but Congress has already decided that they are. Council, we said in the Verlinden case that the FSIA does not appear to have affected the doctrine of foreign known convenience. Now, if that's true, why has it affected the doctrine of international comedy? Well, Mr. Chief Justice- It does seem that the theory of your argument would sweep very broadly and call into question not only foreign known convenience, but the act of state doctrine and other related theories. Sorry for the interruption. Mr. Chief Justice, I have two answers to that. First is that we don't think there was an independent doctrine of comedy-based abstention before the FSIA was enacted. The petitioners in the United States have not identified any case that wasn't either a foreign sovereign immunity case or a foreign nonconvenience case. But second, to the extent that the FSIA displaced any existing common law doctrines, they were doctrines that were directed to foreign sovereign immunity or things like that. So my friend, Mr. Silbert, describes the comedy inquiry as directed to the dignity interest of the foreign sovereign to the extent that's different from the foreign sovereign immunity inquiry. It's hard to tell how it's different, but it would have been subsumed by the FSIA. In contrast, the foreign nonconvenience is a generally applicable common law doctrine that survives. And generally, when a statute is enacted, we don't think that it displaces generally applicable common law doctrines that aren't directly sort of addressed by the statute. Counsel, your position is categorical. In other words, you don't think their international comedy applies in any case. And yet it's, given the nature of international relations, it's easy to envision cases where it would seem particularly inappropriate for United States courts to get involved in litigation. I don't know if this is one of them or not. I mean, is there room for any kind of a safety valve under your theory where the doctrine is, while maybe not available in the normal course, is appropriate in particularly sensitive international relations cases? Mr. Chief Justice, I think there are a number of safety valves that already exist, including things like statute of limitations, the active state doctrine, political question doctrine, forum nonconvenience. In addition, we also have our fallback argument that if you disagree that there is no doctrine of comedy-based abstention that's available, it should at least only be available where the executive branch comes in and asks for a specific case to be dismissed. That would respect the constitutional assignment of foreign policy authority to the elected branches and would maintain political accountability for those kinds of decisions. Thank you, counsel. Justice Thomas. Thank you, Mr. Chief Justice. Counsel, if we reverse in the, again, this is a hypothetical. If we were to reverse in the Germany case, what should we do with this case? I think you should affirm in this case. I mean, so first I'll say I think you should not reverse in the Germany case. I think there's a strong textual argument that takings that are themselves acts of genocide are covered by the expropriation exception. I also wanna say there are reasons maybe to view the facts alleged in the Germany case differently from the facts alleged in this case. In this case, the plaintiffs alleged that Hungary took every single thing they owned, including things that are necessary for survival. And that is more clearly a genocidal type of taking, perhaps, than the takings that are alleged in Germany. But there are also these alternative arguments that are available and that were raised by us below, which is that the plaintiffs, some of our plaintiffs were never Hungarian nationals. They lived in occupied territories and were never treated as Hungarians. And so they should have an opportunity to make their claim under whatever rule this court says applies under the expropriation exception. The other plaintiffs were certainly not treated as Hungarian nationals or citizens. They were stripped of all rights and privileges of nationality. And they should similarly have a chance to make their claim. Could you spend a few, a little bit of your time to explain whether or not you preserve the genocidal taking argument? We did that. I mean, that issue was decided in this case in the first appeal on the D.C. Circuit. Hungary did not raise it in its cert petition in this case. But of course, as you know, Germany did and you granted cert on that question. It's a question that goes to subject matter jurisdiction and perhaps you're asking why we chose to address it even though it's not one of the questions presented in this case raised by Hungary. And that's because, as I said, we think that considering that question in the context of the facts of this case is clarifying. And also it is a subject matter jurisdiction question that Hungary has said it intends to take advantage of if Germany prevails. You, in your answers, you seem pretty firm that under FSIA, there's no room to create new extension doctrines. What's your view of a court staying FSIA proceedings? Well, it would depend on the basis for staying. I mean, as one of your colleagues has said, there is generally an unflagging obligation to exercise jurisdiction that's been given by Congress. There are some abstention doctrines that will allow a court to stay damages actions when there are, for example, pending proceedings in another forum. There's no such pending proceedings in this case. Thank you. Justice Breyer. Thank you. A group of victims of apartheid sue, maybe they're from Botswana. They sue the South African government on a claim that fits within this for taking their property, et cetera. South Africa says, you don't understand. We don't have apartheid anymore. And we have a system for dealing with it. It's called the Truth and Reconciliation Committee. Please don't mess up what we're trying to do, judge in New York. Dismiss the case or use comedy. What's supposed to happen on your theory? Well, I think we could imagine in that case, perhaps the State Department would come in and say- Okay, I see what you're doing. You're taking some factors and saying, it doesn't zero exist. It exists, but only a few things are allowed to appeal to comedy. Is that right? Justice Breyer, we think it doesn't exist, but we think if the court disagrees with that, it should at least- Yeah, I got that point. But my question is, fine, you think it don't exist. It doesn't exist. So when the people from Botswana sue on apartheid, the South African government, and the South African government says, please don't do this. You're gonna mess up our Truth and Reconciliation. The answer for your first choice is to say, too bad. We go ahead with the suit anyway. Is that right? It's right if all of the requirements of the FSA are met. That makes your second position. Your second position says, well, maybe not sometimes. And that's where deference to well-considered views of the executive branch. That's one of them. You agree with that one, right? Yes. Then you agree with the general practice of other nations, particularly the reciprocal practice of a nation directly implicated. That's a fire. We think that's a question for Congress or perhaps the executive. So you say, don't take that. Even if every other nation does it the different way, don't do it. I'm just trying to get your position on this. Yes, because- What about the third? Applicable of US statutes or treaties that demonstrate a strong sovereign interest to ignore or displace foreign sovereign acts or interests in this situation. If claims have been displaced by Congress or the executive, then the claims have been displaced. I just wanna make one point on the reciprocity point, which is that the expropriation exception does not exist anywhere else in the world in the context of foreign sovereign immunity. And so that sort of reciprocity risk is baked into the statute intentionally by Congress. Okay. Then what I'm doing, I'm reading to you, as you know, Professor Eistraker's four considerations that would go into comedy. And so it seems to me that at least your second choice  Right, I mean, our basic- Is that right? That's right, yes. Our basic principle is that those professors are asking district courts to make foreign policy determinations. That's not the constitutional role of a district court. I mean, under separation of powers principles, those determinations are assigned to our elected branches. Here, Congress has made the comedy-based decision about what types of claims can be brought in US courts. In Berlin- You would read that statute as saying, well, South Africa, you're trying to end the bitterness caused by apartheid, but that's just too bad. I mean, if all of the requirements of the MSAA are satisfied, then yes. Yes, okay. But again, the executive branch can come in and try to intervene. They have not done so in this case. They've been invited multiple times to express their view about whether this suit should be dismissed, including today, and they have declined to do that. It shouldn't be up to a district court to make that foreign policy determination in the absence of direction from the executive when Congress has provided jurisdiction. Thank you. Justice Alito. Counsel, I think you really do have to choose between two alternatives. Your primary argument is never. This doctrine doesn't exist. There are no circumstances in which a case could be dismissed based on comedy abstention. And so if there were a case at some time in the future where going forward would cause grave foreign policy problems, your answer has to be, that's just too bad. Is that really your, is that your argument? I'd say two things. First, as I mentioned to the Chief Justice, there are a number of other doctrines that will weed out lots of these cases like foreign nonconvenience, political question, active state, things like that. But second- Yeah, but there could be cases that don't fall within any of those doctrines that could have very serious foreign policy implications. I mean, your argument might be right, but you have to, either you have to say yes, even if it means war, even if it means very serious foreign policy problems, we want you to say never. Or you have your fallback argument, which is, well, maybe if the State Department comes in and says, please do not go forward with this, it will cause terrible international repercussions. I mean, that's a fallback argument, but that argument negates your primary argument that this doctrine never existed and therefore it doesn't exist at this time. Right, we think Congress has already made these foreign policy determinations and they've taken into account comedy when it enacted the FSIA. As we explained in our brief, Congress and the executives can step in and settle certain categories of claims that they think pose a sort of risk to foreign policy. They haven't done that here. And as a fallback, and it is an alternative argument because it would sort of undermine our argument about comprehensiveness and clarity of rules. But as a backup argument, we're saying, if you're gonna dismiss the case based on foreign policy concerns, it really shouldn't be a court with all due respect to courts that's making that decision. It should be an elected branch of government. Well, there is the do no harm principle. And the only issue that is before us, assuming that you would prevail on the jurisdictional question, is whether this doctrine should be, whether we should hold that this doctrine doesn't exist at all, can never be invoked under any imaginable circumstances. It could be that this is just a very, very narrow doctrine. All we would need to decide is it does exist in some form. I mean, Justice Alito, I think it would be helpful to provide more guidance than that, precisely because the FSIA was meant to get rid of this system where you made these sort of case-by-case ad hoc determinations based on the foreign policy considerations of the moment. It was intended to get rid of what this court has called the bedlam of these sort of inconsistent rules and sort of, as I mentioned, the ad hoc determination of whether and when courts should exercise jurisdiction. And so if you're gonna say sometimes you can have comity-based abstention, it would be helpful to have some guidance about when that is. And I think the factors that Hungary and the United States have pointed to, that's just a subset of factors that are already accounted for in the foreign nonconvenience doctrine. And those are the factors that are already accounted for in the FSIA and generally in the foreign sovereign immunity doctrine. But, you know, Congress could, if Congress wants the answer to be never, Congress could so provide as it has in some statutes. Why should we take the lead on that? Well, I think the existence of the Foreign Sovereign Immunity Act, which is a finely reticulated and frequently updated statute, is a strong indication that those are the rules that are intended to apply when you're asking about when a court should exercise jurisdiction over a foreign sovereign. Thank you, counsel. Justice Sotomayor? Counsel, I'd like to follow up a little bit on Justice Alito's questions. But my simple question to you is, again, hypothetically, if we were to rule that there is no international expropriation, customary international law for expropriation from national, do you also believe that we should address this commodity issue, notwithstanding that we held there was no jurisdiction? I mean, I think you would need to, because even if you think that there's no jurisdiction under the theory that these takings are genocidal and therefore violate international law, as I mentioned earlier, the plaintiff still should have a right to make a case that they would fall in under whatever rule you announce does apply. So as I mentioned, some of the plaintiffs were never Hungarian nationals. They lived in occupied territories. The rest of the plaintiffs were certainly stripped of all of their rights and privileges of nationality and citizenship before they were kicked out of their homes and forced into ghettos and then deported to be murdered in the death camps. All right, then one follow-up question to this. Assume that we find a never answer to be inappropriate, because we have at least two shipping cases, the Carolina and the Infanta, in which 19th century courts declined jurisdiction, at least in part out of concern for commercial relations between the U.S. and a foreign sovereign. So it does suggest some equity principles or comedy principles that have guided courts in the common law. So if we never say never, how should we write it? To narrow it, what sort of extremes do you think might justify the use of that doctrine? So sorry for the interruption. I would first say, I think those cases that you cite are really viewed as foreign nonconvenience cases. Mr. Silbert says that foreign nonconvenience and Mr. Snyder said too, is just directed to the convenience of the parties, but there are also the public factors that have to be taken into consideration and those address the interests of the two different court systems in hearing the case. And so I think those cases are examples of foreign nonconvenience cases, not comedy cases. But if you're gonna actually answer your question, I think what you would need is some indication from one of the elected branches that there is actually a foreign policy concern. I don't think you can have a court abstaining from exercising its jurisdiction based on its own assessment of a foreign policy concern. Thank you, counsel. Thank you. Justice Kagan. Ms. Arango, on much the same subject. I mean, just think about these cases particularly. I think it's not yours, but the Hungary case in the Seventh Circuit, which involved very similar claims. It had potential damages amounting to 40% of Hungary's GDP. So this is a suit that could essentially bankrupt a foreign nation. Now, that seems as though it's screaming severe international friction. Why shouldn't we be able to acknowledge something like that? Well, Justice Kagan, I think any sort of speculation about the damages amount that would be implicated in this case is just that it's pure speculation at this point. No class has been certified. We don't know how large the class would be if it were certified. And so I don't think a district court at the very front end of the case should be saying, well, maybe if it was a giant class and they proved all their damages, it would be too much money. And therefore we should just abstain from exercising jurisdiction. That's just not normally the way that kind of inquiry works. And again, if the United States thinks it's a problem, they can come in and say so as they have. I mean, Hungary is very different from many of the other access allied and access abetting countries in that it has never taken any steps to reach a comprehensive settlement. If you have countries like Germany, Switzerland, France, Austria, who have cooperated with the United States to create these alternative fora to resolve these claims on a global basis. That was going to be my next question, Ms. Harrington, because the SG tells us that if we don't recognize this kind of abstention, then the government is going to be hampered in its efforts to encourage the establishment of redress and compensation mechanisms for human rights violations. And in some countries that has worked to at least some extent. So what's your answer to the Solicitor General's position on that score? And do you really think that we can treat Hungary differently because those efforts have not succeeded as well? So this court explained in the Garamendi case that it was actually the filing of class action lawsuits related to Holocaust era claims that spurred those other countries to create these alternative fora in cooperation with the United States. And so I think it's absolutely backwards to say, well, we should just get rid of all these suits and that's gonna actually be the thing that motivates the remaining countries to come to the table. And in terms of whether we should treat them differently, the United States treats them differently. I mean, the United States came into this case and the district court uninvited and asked the district court to dismiss the Austrian owned company that was the other defendant precisely because Austrian companies have come to the table and created this alternative way to resolve these disputes on a global basis. They didn't do the same for Hungary or the Hungary on railroad. And so the United States is obviously treating them differently in that respect and it's perfectly appropriate for the court to do so as well. Will your position leave private litigants in a better position than sovereign litigants? It won't. I mean, I don't think, so Hungary relies on these couple of courts of appeal that in the last 15 years have recognized a doctrine of international company-based suspension. Those cases came 30 years after the FSIA was enacted. And in the two primary cases that they rely on, the United States actually did come in and specifically request that the cases be dismissed. That's Ungaro, Banagas and Mujica in the ninth circuit. The first is in the 11th circuit. And the courts in those cases gave this positive way to the United States' request that the suits be dismissed based on foreign policy concerns. So it's just not true that it's easier to sue foreign sovereigns than private plaintiffs. In fact, the only Holocaust-era class actions or most of them that have actually reached a substantive result in US courts have been against private companies. Thank you, Ms. Harrington. Justice Gorsuch? Good morning, Ms. Harrington. I'd like to address a slightly different point that you've alluded to a couple of times. Normally, takings within a country are subject to domestic takings laws. You've argued in this suit that the Holocaust and human rights forms an exception to that rule, but you've also pressed the point and alluded to it today that even if that rule were normally to apply, it wouldn't here because Germany and perhaps Hungary stripped citizenship from its Jewish victims during the Holocaust. It's a very interesting argument, but it's not developed much in this court. And I'm just curious why and what we should do about it. It hasn't been developed much in this court because it's not actually the question that's presented. It's not the basis that the DC Circuit relied on in deciding the two cases. So I think that is an issue that would need to be resolved on remand. I think that's the most appropriate way to resolve it since it hasn't really been briefed and wasn't squarely presented in Germany's petition. Thank you. Justice Kavanaugh? Good morning, Ms. Harrington. I think you agree that foreign non-convenience survives the FSIA. So I take from that that the FSIA would not displace comedy if a comedy doctrine exists and existed at the time. And you've made important arguments, as have Professors Dodge and Gardner, that the doctrine doesn't exist. And I understand those, but put those aside for now. If the doctrine does exist, then the question's how to apply it. And I did not view it necessarily, again, assuming it exists, as requiring a case-by-case foreign policy or international friction evaluation, in part for reasons others have expressed. That would not be predictable. It would be hard for courts to do that. Wouldn't necessarily be equitable, given the number of courts who would be involved hearing similarly situated plaintiffs. Rather, I viewed the doctrine, at least as it's been articulating, as reflecting a general foreign policy concern. And then the question becomes the particulars of the doctrine. And I had understood the argument to be that if foreign defendants harm foreign parties in a foreign country, and remedies are available in the foreign country, then an American court should usually abstain. So again, if the doctrine exists, what is the problem with that kind of fairly bright line principle that would not require a case-by-case evaluation of foreign policy interests? Well, Justice Kavanaugh, any such doctrine was plainly displaced by the FSAA. This court held in Verlinden that Congress intended in the FSAA to grant U.S. courts jurisdiction over suits by foreign plaintiffs against a foreign sovereign based on domestic state law. And the expropriation, excuse me, the expropriation exception that we're relying on here expressly applies to conduct that occurred abroad. It's principally directed to nationalization of property, and that has to occur abroad. We think it also applies here where you have genocidal takings, but there's no reason that those shouldn't also be covered if they happen abroad. And so to the extent any such doctrine like that did exist, we think it was plainly displaced by the FSAA. And it was not, you know, it was sort of not a consideration that was separate from foreign sovereign immunity determinations that were made at common law. But if such a doctrine exists in the articulation I just provided applied to private foreign defendants as well, do you still have the same argument? Well, I mean, it would depend on the context. You know, Hungary relies on the ATS cases, but what the court is doing in the ATS cases is just fundamentally different from what it's being asked to do here or there. What the court is doing is asking whether there is jurisdiction, not making a determination about whether a court should abstain from exercising jurisdiction that plainly exists. And so the sort of separation of powers and small fee conservative way that courts should sort of wade into foreign policy determinations points in the opposite direction in the two types of cases. Here, if a court says, I'm gonna abstain from exercising jurisdiction, it's countermanding foreign policy determinations that Congress has already made. In the ATS context, if a court says, I'm going to recognize this inferred cause of action, it's kind of venturing out into a foreign policy way, in a foreign policy way, excuse me, in a way that Congress has not yet done. But that would lead, if that applied the way you just described, that would lead to a private defendant case and being the court would abstain in a country defendant case, the court would not abstain, which seems unusual. Well, it wouldn't be an abstention, Justice Kavanaugh. It would be a determination that there is no jurisdiction in the first place. And that's a determination that's up to Congress to make. Okay, I take that point. Thank you very much, Ms. Harrington. Thank you. Justice Barrett. Good morning, Ms. Harrington. I have a question about the nature of this kind of comedy doctrine, especially as compared to foreign nonconvenience. So everybody agrees that foreign nonconvenience doctrine survives the enactment of the FSIA. And I'm wondering why, in your view, is that because foreign nonconvenience doctrine is a background principle that's incorporated somehow into the statute itself? Or is that because courts retain the power to develop it as a common law doctrine? And if the latter, why wouldn't they retain the power to develop a doctrine of comedy like Hungary proposes here? So it's more of the latter. I mean, there's a general background principle that statutes don't displace common law, you know, sort of generally applicable common law doctrines, unless there's some indication in the statute itself that that's the intent of the statute. And so, for example, foreign sovereign immunity, everyone agrees, was a common law background doctrine, excuse me, common law doctrine that was displaced by the FSIA. To the extent there was any separate comedy abstention doctrine, which we don't think there was, but if you disagree, we think it was also subsumed within and displaced by the FSIA. Because as my friend Mr. Silbert described, the comedy-based inquiry, what the court is supposed to do is think about the dignity interest of the foreign sovereign. It's really hard to see how that is separate from the foreign sovereign immunity doctrine in a way that the FSIA was not intended to account for. So your argument is that courts may retain some authority to recognize some of these abstention-based doctrines like foreign nonconvenience, but the structure and the text of the FSIA preclude us from doing so here? Yes, I mean, I just add that the State Department, when it transmitted the draft bill in 1973 to Congress, it included a section-by-section analysis. And in that it said, we don't think this would displace foreign nonconvenience doctrine. So it was sort of baked into the enactment history of the FSIA. And let me ask you a question about the citizenship point. You point out that some of the plaintiffs in the suit below were not Hungarian nationals and others have a claim to their citizenship having been severed by the genocide. Is that a claim that you raised below? As Justice Gorsuch pointed out, it's not one that's developed here. It wasn't part of the QP. Did you raise that below or develop it all below? And if not, did you have to in order to preserve it? We did raise it below. And I regret that I don't have the exact citation, but it was raised in the briefing on appeal. Okay, thanks counsel. You have several minutes to wrap up Ms. Harrington. Okay, thank you, Mr. Chief Justice. I just wanna sort of linger for a second on the separation of powers point. The constitution assigns authority over foreign policy to the elected branches. Here, Congress has decided that this type of claim, this is the type of claim that US courts should hear. And the executive, even after being invited multiple times to disagree with respect to this specific case, has declined to do that. In these circumstances, the court should not be able to step in and disregard its statutory jurisdiction based on its own assessment of foreign policy concerns. That scheme would raise serious separation of powers concerns and would completely undermine the central purpose of the FSIA, which was to eliminate case specific foreign policy concerns from questions about when a court should exercise jurisdiction over a foreign sovereign. And just one final point, I would like to just say another word on the other question that you're considering this morning in the Germany case. That question is whether a taking that is itself genocide is a taking that violates international law. Under the plain and broad text of the expropriation exception, it is. And considering that question, I really invite the court to consider the facts of this case, which arise out of the worst atrocities in human history. Here, Hungary took everything the plaintiff owned, including possessions necessary to survive, such as shelter, clothing, and medicine. And the undisputed purpose of Hungary's takings was to bring about the physical destruction of Jews in Hungary. That is genocide. And it is hard to imagine a more vivid example of property takings that themselves violate international law. Indeed, the only US interest that the Solicitor General's office or the Department of Justice has identified in this case in the 10 years of litigating it is the moral imperative to provide victims of the Holocaust with some relief in their lifetimes. There's no way to read the text of the expropriation exception as withholding jurisdiction in this case. And there is no room in the FSIA's comprehensive scheme to allow extensions based on international comity. Thank you, Mr. Chief Justice. Thank you, counsel. Rebuttal, Mr. Silbert. Thank you, Mr. Chief Justice. I have three points. First, I did not hear my friend give you any real workable limiting principle or safety valve for her position. And I think that colloquies with Justice Breyer and Justice Alito brought that out. The fact is, if you accept my friend's interpretation of the FSIA, then US courts not only can, but must hear cases alleging that foreign sovereigns harmed other foreigners in foreign countries. There is no doubt that those cases will be asserted here. And some of them will be highly problematic like the South Africa hypo that Justice Breyer proposed. I think foreign nations will be understandably upset if US courts adjudicate foreign disputes where foreign interests predominate and there is little, if any, US interest on the other side. When US courts decide cases like that, they cause meaningful harm to international relations and they expose the United States to similar litigation in foreign courts. Second point, I think the test of the FSIA just does not do the work that my friend needs it to do. The expropriation exception withdraws sovereign immunity from jurisdiction. It doesn't do anything else. The comedy abstention doctrine that we're asserting predates the FSIA by about 100 years. So the question is whether the FSIA affirmatively displaced it, and clearly it did not. If the FSIA actually displaced all comedy defenses in favor of a foreign sovereign, as my friend proposes, then the acts of state doctrine would also be displaced. But this court held in Altman that it isn't. If Congress wants to go further and invite the kinds of foreign policy consequences that will follow, if US courts are compelled to hear cases like this one, then Congress can certainly do that. But that is not what Congress said in the FSIA and the court should not take on those foreign policy risks on their own without clear instructions from Congress and the executive. Last point, I think you should take the reciprocity concerns in this case very seriously because it's an unfortunate fact, but a fact we all know, that the United States government has sometimes fallen short of the ideals of justice that every nation should aspire to meet. And some people say that the United States owes large outstanding debts for injustices that were committed in this country. That's a profoundly important question. And maybe one day Congress will address it, or maybe one day it will come before this court. But I bet we can all agree that the remedies for the worst injustices committed by the United States in the United States should not be decided by a Hungarian judge applying Hungarian law from a courtroom in Budapest. For the same reasons, the merits of this case should not be decided by an American judge applying American law in Washington, DC. Thank you, counsel. The case is submitted.